We now move to the next case on our calendar, and that is Freud v. New York City. So Mr. Carlin, you have ten minutes, but you've reserved three minutes for rebuttal. Let's just give everybody a minute to clear out. All right. Mr. Carlin, you may begin. Good morning. May it please the court, my name is Stuart Carlin. I'm representing the appellate Abraham Freud in this case. And I'd like to start off first with the retaliation claim. And there's a couple of things I'd like to point out to the court, because there's an agreement on most of the elements of the retaliation claim. First, there's protected activity. The DOE on page 41 concedes that there was protected activity in their brief. The protected activity consisted of a series of letters written from December of 2018 to April of 2019, where Mr. Freud was complaining, sending letters and complaining that he was being discriminated against because he was an Orthodox Jew. There was a civil rights complaint filed in January of 2019. Well, look, what the court really went off on was that the alleged retaliation didn't amount to something that would discourage or dissuade a reasonable worker from making discrimination claims in the future. And so I think that's really where you should be focused. Right. So it seems to me that what you're alleging is that they didn't tell him about an upcoming field trip. They required him to go directly through an assistant principal to get supplies. They delivered his iPads late and they assigned him to teach a remote class during the pandemic from inside the school building rather than from home. If I can address that. Number one, that was not addressed in the summary judgment motion. On the retaliation claim, it was not addressed on the summary judgment motion in their memo, which is not in the record. On pages, I believe it was pages 29 to 31. It was really the causal relationship that was the focus of the retaliation claim, not whether or not it would dissuade a reasonable person from complaining. So I just respectfully submitted that that in and of itself is was waived. But even assuming arguendo that it wasn't waived, there is still a series of things that occur. And of course, even if it's not timely and there's an issue as to whether or not there's a continuing violation, there was a host of things that did occur. Some of them very, very significant from April of 2019, which is when statute of limitations would have started. Actually, that would be the deadline if you go 300 days back. It's respectfully submitted that you could still look at the other conduct to assess even if there isn't a- Well, that's due to the discrimination claim you're talking about, right? Well, yes. But there was also on page 79 of the record a series of letters that were written in complaining about unequal treatment. We didn't really stress that in the brief, but it is in the amended complaint. But to get to your question about whether or not it would dissuade a reasonable person from complaining, the most obvious and most significant event that took place was this assignment that in September of 2019, a classroom of six, four of them needed one-on-one paraprofessionals. None of them were- four out of the six, or it may have been six out of the six, were not toilet trained. He was the only teacher to have had that happen. They were on toilet schedules. He was assigned to the fifth floor without any bathroom facilities. And what protected activity do you connect that consequence to? Well, that would have been to his- if you look at the entire record, a series of letters that he wrote from September of 2018 to December of 2018 claiming unequal treatment. Another series of letters that were written where he specifically mentioned discriminatory treatment from September- from December of 2018 to April of 2019, a complaint that was filed with the Civil Rights- Department of Justice Civil Rights in January of 2019 and in August of 2019. So if you look at the causal relationship, there is a significant amount of protected activity, some of it on the eve of his assignment within weeks of this assignment, keeping in mind here that this is a motion to dismiss. The question is plausibility in a motion to dismiss during every reasonable favorable inference in favor of- in favor of the non-mover here, which is the plaintiff. I would respectfully submit that alone, that one single incident alone, there were a number of other things that happened. Power professionals were told not to help him. He was short-staffed in power professionals. They were given power professionals who were not properly- he was given power professionals who were not properly trained. There's a list of things that happened to him, some of them more significant than others. But in totality, in aggregate, when you look at the totality of the circumstances, it would certainly deter a reasonable person from complaining and particularly his assignment, which he had to live with every single day until March of 2020 and it went remote because of the pandemic. So it's respectfully submitted that at the very minimum, the retaliation claim, you have the causal relationship, you have the protected activity, and you- Was he the most, remind me, was he the, in terms of seniority, the most senior at this school? I don't know. We have no discovery. He had 20 years of service. It's not unusual for the DOE to have long-term employees, Your Honor. So he was a highly experienced special ed teacher, right? He was experienced, yes, but the point is- Very highly experienced. 20 years experience, right, but- So why couldn't he expect the principal to give him a challenging assignment? Well, Your Honor, there may have been, he had the most difficult class under the most difficult circumstances. Just using my common experience here, there are a number of employees that have many, many years of service, and he was singled out and given the most difficult students. We're at the plausibility stage here, Your Honor, and it is entirely plausible that on the eve of filing a civil rights complaint, he's given the most difficult students who are not thoroughly trained on the fifth floor, without a bathroom, and without adequate paraprofessional support. Thank you. We have reserved three minutes for Dr. Mr. Carlin, but now we'll hear from Ms. Lawless. Good morning, Your Honors. May it please the court, Diana Lawless on behalf of the defendants. The district court properly dismissed the amended complaint. I know this part of the argument focused on retaliation, but really I think that this is just a list of things that the plaintiff believes happened to him. It's evidenced by the chart that is in the brief of eight pages long about things that he thinks were adverse. I think, Judge Sullivan, you listed explain the timely conduct, that it's a very few things that happened in this very limited period from 2019 through 2021, I believe. And definitely for discrimination, none of this would be adverse employment actions. They don't involve material effects on his employment. They don't involve material effects, conditions of his employment. As to the retaliation claim, it was, as Judge Sullivan said, the key part of the district court's decision was, again, to say that this would not dissuade a reasonable person from complaining. I do admit that below, at a time when this case had many, many more claims than other cases have been narrowed to now, it was not the focus of our motion below. However, I think the arguments are very much similar or identical to the way that they would be for discrimination. But in any event, it's hard to tell, and there's no argument really from my adversary about the timeliness and the connections of these complaints to acts that are years later, months later, and happened along with things, other things that he was saying was happening to him. I don't, there's no temporal proximity, you have to allege, for retaliation in particular, but for causal link. And it has to be very close, and he really just lists his allegations here without analysis, or even a comparison of the time between the protected activity and the retaliatory acts. And I will note that in his argument, he seems to mix up the discrimination claim with the retaliation claim. Well, that's what I was concerned about. Right. So I guess, when does the clock, from your perspective, when does the clock begin on the retaliation? In other words, so when does he take protected activity, engage in protected activity, so that that's the starting point for his retaliation claim? I mean, he does say that he did send letters, right? He sent letters between December 2018 and April 2019. There was a complaint to the Department of Education in the summer of 2019. I guess you could tie each to each, and then there was a February 2020 EOC charge in the filing of the lawsuit. But for anything that happened between 2018 and April 2019, conduct that happened before April 12, 2019 is also time barred, right? So you only listed the four things that really happened that could be timely for this litigation. The things that- So, I mean, except in time bar and the clear guidance from this court and others on that, what is the relevant protected act? Well, I- From your perspective. Sure. So I think, oh, sorry. So for conduct between the 2019 school year, which I think is about the end of that school year, is the comment to him about what he should be doing. I think it's about the iPads and when they came to the classroom. Those are the only things that can be connected to those letters. And I don't think that those things, particularly since he got the iPads later, could dissuade somebody from complaining. And then there's this federal civil rights complaint in summer of 2019 that could only affect things that happened after that. And I mean, there's not really anything that happens after that in the 2019 and the 2020 charge, except for the issues with regard to his 2020 accommodation during the pandemic and when he was in the classroom and when he was allowed to work from home. So I don't think that he was allowed to work from home. He continued to work. And then there was an assignment to come back in summer of 2021. At the time he amended the complaint, he was still working from home. It had not yet materialized that he would have to come back to the school. And that's something that has a story that has not been told at all. We don't have those facts in this complaint. And so I just don't see a causal nexus between the complaints and any of those events. And as Judge Parker said, in terms of why he was having these conditions of his work, if we can consider those at all, the conditions of what assignments he had, the classroom assignments, which was really conduct that happened earlier, he alleges he was the most senior teacher. He'd been at that school for 11 to 15, that school itself, that specific school for 11 to 15 years at the time that the conduct is alleged here. And the only allegation he makes, he doesn't make allegations about the experience of the other teachers, about what their classrooms were like, what students they had to teach, what level all the students were in the school. All he says was that he was the only Orthodox Jewish teacher. And that's not enough, I think, for discrimination. This school covered what grades? I believe this was a special education. I know he was teaching fourth and fifth grade. And actually, this school was elementary school grades. It was part of a larger network of schools that covered special education students through higher grades. So that's K through 6? I think this was K through 6. He was definitely teaching fourth and fifth grade in this school at the time. So if your honors have no further questions, I rest on my brief for the rest of my arguments, and we ask that you affirm. Thank you. Okay. Mr. Carlin, you have three minutes to rebuttal. A couple of things regarding the evidence of discrimination. He doesn't say he was the most senior teacher. He did say he was a senior teacher, period. Regarding the discrimination, the AP made comments about Jewish people. Find another job Jews haven't made. That sounds like your hostile work environment claim, right? Right, but it also shows discriminatory intent. One of the arguments is, well, it's just a list of grievances, basically, about how he's being treated. Well, if he's being treated because he's a practicing Orthodox Jew, then that goes to – it's a combination of how he's being treated in the comments. But what is there to suggest that the statement, Jews haven't made, or do all Jews leave their jobs early on Fridays, that the person who made that statement is responsible for the adverse actions that you're describing? The person is an assistant principal that he reported to. So, and again, we're at the pleading stage here. I mean, we're at the – we're not even on first base to use baseball parlors. We're at the pleading stage. No, no, I understand that. But so what does the pleading show with respect to those statements being connected to the adverse actions? Well, we don't know precisely at this point. The immediate supervisor, his immediate supervisor made those comments, the one in June. Do all you Jews leave early from job on Fridays? You Jews haven't made. I mean, so – and then when you couple that with the conduct, and here's just some of the conduct that occurred. This is the preconduct, the biased evaluation, the transfer, getting more disruptive students. By saying when you couple it, I'm having really difficulty following your analysis of cause and effect. These statements are connected by way of time proximity in some other fashion to all of these many, many things over many, many years that he's complaining about. Right. Okay. So in the post, he stopped – he had complaints from December through April. He had another civil rights complaint in August. During that time, he was excluded from grade-level meetings. He didn't get his iPads during that time for his students. His report cards were tampered with. He was assigned low-functioning students in the summer. He was supposed to have four powers. He only had two powers during the summer. He was relocated to another site during the summer. And it's your position that the school administrators wanted him to fail in his professional performance because he was Jewish. They wanted him out. Maybe he would have sought a transfer in the complaint. They talk about him, that they wanted him out in 2007. They wanted him to fail as a teacher. They wanted to create a hostile work environment. They gave him a room on the third floor rather than the fourth floor because he was Jewish? Yes. And there were comments made, and they created a hostile work environment in order to induce him to leave. In the complaint, they say, if you transfer, we'll give you a good evaluation, so on and so forth. We want you out of here. So when he said no, then they stepped up a campaign to create an unpleasant work environment. So post-2019, besides what I had just mentioned, he had four students. He only had two powers in the summer. I alluded to what happened to him within weeks of him filing a complaint. He was assigned a class without adequate support, the most difficult students, and all grouped together on the fifth floor. They weren't toilet trained, and they were on toilet schedules. He was the only teacher in the school. Mr. Carlin, how does a reversal not then create the rule that a teacher who engages in some protected activity then can never get assigned difficult students? Well, Your Honor, he's a special ed teacher. He's going to get assigned difficult students, but he shouldn't be assigned the most difficult students and the number of difficult students. All of them had one-on-one powers. They were not toilet trained. These are the most difficult students. And we're at the pleading stage here, Your Honor, with all due respect. And maybe they said he was a fantastic special ed teacher. We're going to give him the most difficult students, period. And maybe that's not the case. Maybe they were retaliating against him because he filed a complaint in August of 2019. One plausible explanation is that they were retaliating against him, and we're dealing with a plausibility standard at this point. He also had difficulty, you know, this is post-2019, April 2019, getting time off of work in terms of working remotely. He had difficulty with that. Getting time off from work in terms of working remotely. I didn't word it properly, Your Honor. He had put an application in to work remotely. It was delayed. It was delayed. It was delayed. He did eventually get that it was allowed to work remotely. He wasn't advised of it right away. It's just another thing that occurred to him subsequent to April 12th, 2019. The other thing is the continuing violation issue, which we haven't really discussed at all. Well, I think, look, it's in the brief, but we're well over your rebuttal time. So we will reserve decision. Thank you both. Okay.